UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

New Hampshire Right to Life

     v.                                   Civil No. 11-cv-585-JL
                                           Opinion No. 2013 DNH 132
Department of Health and
Human Services

**MEMORANDUM ORDER**

This action presents several questions over the application of various exceptions to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA" or "the Act").  Invoking the Act, the plaintiff, New Hampshire Right to Life, requested the release of documents by the defendant, the Department of Health and Human Services ("HHS"), concerning its September 2011 award of a "sole-source discretionary replacement grant" to Planned Parenthood of New England ("Planned Parenthood").  After HHS failed to respond to Right to Life's request by the 20-day statutory deadline, Right to Life commenced this action, invoking this court's jurisdiction under FOIA.  See 5 U.S.C. § 552(a)(4)(B).  HHS has since released more than 2,500 pages of documents in response to Right to Life's request (and two related ones), but has refused to release other documents, or has released documents in redacted form, invoking three different statutory exceptions to FOIA.

The parties have filed cross-motions for summary judgment, see Fed. R. Civ. P. 56, as to whether HHS correctly invoked these exceptions.  The exceptions at issue, as set forth in FOIA, are:

> (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
>
> (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency; [and]
>
> (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]

5 U.S.C. § 552(b).  Together with its motion and supporting memorandum, which also serves as an objection to Right to Life's summary judgment motion, HHS has submitted a revised "Vaughn index" listing 34 different categories of documents that HHS has continued to withhold, together with a brief description of each and the FOIA exception invoked as the basis of the withholding.[1] HHS has also submitted declarations from two HHS officials (one involved in awarding the grant to Planned Parenthood, the other

---

[1] As the Court of Appeals has explained, "[a] Vaughn index correlates information that an agency decides to withhold with the particular FOIA exemption or exemptions, explaining the agency's justification for nondisclosure." Maynard v. CIA, 986 F.2d 547, 556 (1st Cir. 1993).  Its name is "derived from the seminal case, Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973)." Id. at 556 n.10.

involved in responding to Right to Life's FOIA requests) and from a Planned Parenthood director.

Right to Life, for its part, has filed a memorandum (accompanied by several exhibits) in support of its own motion for summary judgment, as well as a memorandum both objecting to HHS's cross-motion and replying to HHS's objection to Right to Life's summary judgment motion.  HHS has submitted a reply to that filing, and Right to Life has submitted a sur-reply.

Based on these materials, the court grants Right to Life's motion for summary judgment in part and denies it in part, and grants HHS's motion for summary judgment in part and denies it in part.  While HHS has carried its burden to show that the vast majority of the materials it has continued to withhold in response to Right to Life's FOIA requests fall within the claimed exemptions, HHS has failed to carry that burden as to a few categories of information.  Specifically, HHS has not shown that (1) Planned Parenthood's personnel policies amount to "confidential" commercial information, (2) that emails between HHS's regional director and her subordinates advising her on how to conduct a telephone call with a state official are protected by the deliberative process privilege, and (3) that disclosing the curriculum vitae of Planned Parenthood's medical director, or

3

the salaries of Planned Parenthood employees, would amount to a clearly unwarranted invasion of the employees' personal privacy.

I.  **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial, and "material" if it could sway the outcome under applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" parties.  Id.  On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998) (quotation marks omitted).  The standards for summary judgment in a FOIA case are the same as those in any other kind of case.  Francis M. Dougherty et al., Freedom of Information, in 15 Federal Procedure: Lawyers' Edition § 38:461, at 539 (2011).

4

II.   **Background**

A.   **Award of the grant to Planned Parenthood**

The following facts are undisputed.  For decades, HHS has provided federal funding to the State of New Hampshire under Title X of the Public Health Service Act, created by the Family Planning Services and Population Research Act of 1970.  Pub. L. 91-572, § 6(c), 84 Stat. 1504, 1506-08, codified as amended at 42 U.S.C. §§ 300--300a-6.  The purpose of this funding is "to assist in the establishment and operation of voluntary family projects which shall offer a broad range of acceptable and effective family planning methods and services, 42 U.S.C. § 300(a), including, as Right to Life alleges, "free or reduced cost[] birth control, contraception, and other services."  After receiving these funds, as grants from HHS, the State distributes them as subgrants to various entities throughout New Hampshire.  It appears that this was done on an annual basis, and that Planned Parenthood was among those entities that regularly received these subgrants.

In June 2011, however, the New Hampshire Executive Council voted not to award any sub-grants to Planned Parenthood, which operates clinics in six different New Hampshire municipalities, effective July 1, 2011.  In reaching this decision, the Executive Council "expressed its concern that Planned Parenthood was not

able to provide sufficient guarantees that the Title X funds would not be used to subsidize abortions," according to Right to Life.  Since its passage, Title X has prohibited the use of the funding it authorizes "in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.

In response, HHS wrote to its state counterpart, the New Hampshire Department of Health and Human Services, in mid-July 2011.  HHS noted that, due to the Executive Council's decision, "currently there is no funded entity to provide Title X services for [the] portion of the state" served by Planned Parenthood, and expressed concern "that access to Title X family planning services are being negatively impacted for a significant number of individuals in need."  Thus, HHS asked for information on how the State proposed to provide those services in light of the Executive Council's decision.

Later that month, Christie Hager, the Regional Director of HHS's Region I Office (which encompasses New Hampshire) participated in a telephone conference with one of New Hampshire's Executive Councilors, David Wheeler, who had a number of questions about the consequences of the Council's decision to discontinue Planned Parenthood's subgrants.  In preparation for this call, Hager sought assistance from several HHS staffers in

compiling answers to Councilor Wheeler's questions, resulting in two chains of e-mails created prior to the conference call.[2]

In mid-August 2011, the New Hampshire Department of Health and Human Services informed HHS that the state was no longer providing Title X family planning services in the municipalities previously served by Planned Parenthood.  As a result, the New Hampshire Department of Health and Human Services explained, it was relinquishing a portion of the federal grant equal to its projection of what Planned Parenthood would have received to provide those services for the second half of 2011, or approximately $360,000.

A week or so later, on August 19, 2011, Marilyn Keefe, the Deputy Assistant Secretary for Population Affairs of the Office of the Assistant Secretary for Health ("OASH") at HHS, signed a memorandum (dated one day earlier, August 18, 2011) to "OASH, Executive Officer" entitled "Sole Source Justification for Replacement Grant in New Hampshire."  Noting the state's relinquishment of the HHS grant to provide Title X services in the six municipalities previously served by Planned Parenthood,

_____

[2]These e-mails are identified on the revised Vaughn Index as category 9.  In response to Right to Life's FOIA requests, HHS disclosed an e-mail by Hager summarizing the call after it occurred, identified on the revised Vaughn Index as category 37.

the memorandum states that "[a]s a result, there are no Title X
services being provided in [those] areas . . . .  Services need
to be re-established as quickly as possible to minimize the
interruption of needed clinical services and protect the public
health."  Thus, the memorandum explains, HHS's Office of
Population Affairs ("OPA") "is requesting approval of a sole
source replacement grant award to [Planned Parenthood] for a
period of 16 months."

    To justify the "sole source" nature of this action, i.e.,
that Planned Parenthood "is the only entity from which an
application should be sought" for the replacement grant, the
memorandum recites "an urgent need to reinstate services in [the
affected] areas with an experienced provider that is familiar
with the provision of Title X family planning services and
applicable laws . . . and has a history of successfully providing
services in this area of the state."  The memorandum further
explains that "[i]f this recommendation is approved, OPA will
reach out to the proposed replacement grantee to determine if the
organization is willing to take on the project as a directly
funded federal grantee" (underlining omitted).  On August 19,
2011 (the same day Keefe signed it), the memorandum was
countersigned on a blank line indicating "Approve," underneath
the heading "Decision," by Michon Kretschmaier, the OASH

Executive Officer.  The parties vigorously dispute the extent to
which this is the "decision" at issue for purposes of applying
the deliberative process privilege here.  See infra Part
III.B.1.a.

On September 1, 2011, Planned Parenthood submitted a grant
application to HHS and, on September 8, 2011, HHS prepared a
document entitled "Technical Review" evaluating that
application.[3]  The next day, the Assistant Secretary for Health
approved the publication of a notice, on the HHS website, that
HHS "intends to issue a replacement grant to [Planned Parenthood]
to provide Title X family planning services" in the affected
municipalities.  The notice was in fact posted to the HHS website
on September 9, 2011.

Among other things, the notice explained that "[b]ecause of
the urgent need to have Title X services reinstated, and because
of [Planned Parenthood's] prior experience with providing Title X
services in the identified areas," HHS "intends to issue a sole-
source urgent replacement grant award to [Planned Parenthood] for
a period of 16 months."  The notice further explained, however,
that "[t]he entire state of New Hampshire will be in a

---

[3]Both of these documents were disclosed, in redacted form,
in response to Right to Life's FOIA requests.  The application is
identified as category 26, and the Technical Review is identified
as category 27, on the revised Vaughn index.

competitive status in [fiscal year] 2013, with a new grant award period beginning December 31, 2012."

On September 13, 2011, HHS issued a "Notice of Grant Award" to Planned Parenthood.[4]  Among other things, this notice required Planned Parenthood to submit additional information to HHS by December 15, 2011, including "institutional files" on "a variety of policies and procedures."  In response, Planned Parenthood submitted a number of documents to HHS, including information on its fee schedule and personnel policies at its clinics, as well as its "Manual of Medical Standards and Guidelines."[5]  As noted at the outset, HHS has disclosed redacted versions of these documents on the grounds that they contain Planned Parenthood's confidential commercial information, as well as, in some instances, information that, if revealed, would constitute an

---

[4]HHS asserts that this date marked its decision to award the grant to Planned Parenthood--even though, as just discussed, it had announced its "intention" to do so on its website four days earlier, on September 9, 2011.  Whether HHS decided to award the grant to Planned Parenthood on September 9, 2011 or September 14, 2011 is immaterial for present purposes, however, because HHS has not invoked the deliberative process privilege as to any documents created between those two dates.  See infra Part III.B.1.a.  So the court will simply refer to the date of that decision as September 14, 2011.

[5]These documents are identified on the revised Vaughn index as categories 35-39.

invasion of privacy as to one or more of Planned Parenthood's employees.  Right to Life disputes these characterizations.

## B.   Litigation

On October 7, 2011, a month or so after HHS announced its intention to award the grant to Planned Parenthood, counsel for Right to Life presented HHS with a request under FOIA for 27 different categories of documents concerning the award.  At the end of that month, HHS notified counsel for Right to Life that HHS had received his FOIA request and had asked OASH to conduct a search, but would "be unable to comply" with the statutory deadline to respond, see 5 U.S.C. § 552(a)(6)(A)(i), even with

the benefit of the 10-day extension available in "unusual
circumstances," id. § 552(a)(B)(I).[6]

Right to Life then commenced this action in late December
2011, seeking, among other relief, for "HHS to immediately
provide [Right to Life] with all records responsive to the [FOIA]
request."  The case was assigned to Judge Barbadoro.  HHS began
producing documents to Right to Life in early January 2012, in a
series of disclosures that continued well into the spring of that
year.  In the meantime, this court (McCafferty, M.J.) approved,
over Right to Life's objection, HHS's proposed scheduling order
in this matter, which required HHS "to produce all non-exempt
documents on or before April 1, 2012 and to produce its Vaughn
Index on or before April 15, 2012."  Order of Feb. 24, 2012.

---

[6]Right to Life argues in its opening summary judgment
memorandum that HHS failed to comply with the statutory deadlines
for responding to Right to Life's initial FOIA request, but does
not identify any relief to which it would be entitled as a result
of this delay.  Moreover, in its response to HHS's motion for
summary judgment, Right to Life disclaims any suggestion "that
HHS's failure to follow the statute automatically results in a
waiver of all exemptions."  But Right to Life goes on to state
that the late response to the FOIA request "does entitle [it] to
summary judgment on the issue of HHS's failure to comply with the
time requirements of FOIA."  But, on summary judgment or
otherwise, this court can only decide issues that could result in
the provision of some meaningful relief.  See, e.g., Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Because, as
Right to Life more or less acknowledges, a ruling that HHS failed
to comply with the Act's deadlines in responding to the FOIA
request would not provide any meaningful relief, this court
cannot, and does not, make that ruling here.

This order was subsequently modified, with Right to Life's
assent, to add deadlines for HHS to produce, or list on a
supplemental Vaughn index, documents responsive to a request that
counsel for Right to Life had made to counsel for HHS in March
2012.  This request sought the additional information that
Planned Parenthood was required to submit by the Notice of Grant
Award issued in September 2011.  See Part II.A, supra.

One of these documents, as already noted, was Planned
Parenthood's Manual of Medical Standards and Guidelines.  After
determining that certain portions of the manual (totaling 7 of
244 pages) were exempt from disclosure under FOIA, HHS notified
Planned Parenthood that HHS intended to release the balance of
the manual.  In response, Planned Parenthood argued that the
entire manual was in fact confidential commercial information
exempt from disclosure under FOIA, see 5 U.S.C. § 552(b)(4), but
HHS rejected that argument and notified Planned Parenthood that
it intended to proceed with disclosure.

Planned Parenthood then commenced an action in this court
against HHS, seeking to enjoin it from releasing any portion of
the manual.  Planned Parenthood of N. New Eng. v. HHS, No. 12-cv-
163-JL (Apr. 26, 2012).  With Planned Parenthood's assent, HHS
sought, and was granted, a remand of that matter to HHS so it
could "reconsider its FOIA determination in light of additional

13

information provided by [Planned Parenthood] about specific portions of the manual, and produce a more comprehensive explanation for any determination that portions of the manual are subject to disclosure despite [Planned Parenthood's] objections." That action, which had been assigned to the undersigned, was then administratively closed "without prejudice to the possibility of being reopened."  The present case (Right to Life's FOIA action) was then assigned to the undersigned.  Order of May 3, 2012.

Upon reconsideration of its decision to release all but 7 pages of Planned Parenthood's manual, HHS "decided to withhold or redact significant portions" of it.  HHS produced the other portions of the manual to Right to Life in July 2012.  Then, in August 2012, Right to Life submitted another FOIA request to HHS, this time seeking communications between Planned Parenthood and the agency concerning its decisions as to which documents to disclose in response to Right to Life's earlier FOIA requests. HHS made a series of disclosures in response to the August 2012 FOIA request between late August and mid-October 2012.

In the meantime, on April 13, 2012, HHS produced its initial Vaughn index in this matter, and later, in mid-July 2012, submitted a supplemented version which included the portions of the Planned Parenthood manual and other related documents requested by counsel for Right to Life in March 2012.  Based on

14

this Vaughn index, Right to Life filed its motion for summary
judgment.  When HHS filed its objection and cross-motion for
summary judgment, it included a revised Vaughn index, which
excluded certain documents that, while initially withheld, HHS
had decided to release in response to Right to Life's summary
judgment motion.  The documents listed on the revised Vaughn
index, then, are the ones presently in dispute.

## III. **Analysis**

FOIA generally requires federal agencies to make their
records available to any person upon proper request.  See 5
U.S.C. § 552(a)(3)(A).  But this requirement is subject to
several exceptions, three of which are at issue here:

> (4) trade secrets and commercial or financial
> information obtained from a person and privileged or
> confidential;

> (5) inter-agency or intra-agency memorandums or letters
> which would not be available by law to a party other
> than an agency in litigation with the agency; [and]

> (6) personnel and medical files and similar files the
> disclosure of which would constitute a clearly
> unwarranted invasion of personal privacy[.]

5 U.S.C. § 552(b).  As the Court of Appeals has advised, "[t]he
policy underlying FOIA is . . . one of broad disclosure, and the
government must supply any information requested by any
individual unless it determines that a specific exemption,

15

narrowly construed, applies." Church of Scientology Int'l v. Dep't of Justice, 30 F.3d 224, 228 (1st Cir. 1994).  Accordingly, "[t]he government bears the burden of demonstrating the applicability of a claimed exemption, and the district court must determine de novo whether the queried agency has met this burden." Id. (citations omitted).

In moving for summary judgment, Right to Life argues that HHS has failed to show that the exemptions it has invoked in withholding particular documents apply, for a number of reasons. In objecting, and cross-moving for summary judgment, HHS argues that it has in fact carried that burden here.  As explained fully below, the court rules that HHS has sustained its burden to show that an exemption applies to most, but not all, of the information it has continued to withhold from Right to Life.

## A.   **Confidential commercial information** (exemption 4)

HHS has invoked exemption 4, protecting "trade secrets and commercial or financial information obtained from a person and privileged or confidential," in disclosing redacted versions of several documents submitted to HHS by Planned Parenthood.  Again, Planned Parenthood provided those documents in response to the Notice of Grant Award, which required Planned Parenthood's "institutional files" on "a variety of policies and procedures."

16

See Part II.A, supra.  The documents include information on Planned Parenthood's fee schedule, personnel policies, collections policies, and medical standards and guidelines--most significantly, the Manual of Medical Standards and Guidelines.

HHS argues that the redacted portions of these documents constitute Planned Parenthood's confidential commercial information.  But Right to Life maintains that HHS has failed to show that the redacted information is either "commercial" or "confidential."  As explained fully below, the court rules that HHS has, in fact, carried that burden, except as to a single category of documents that it has failed to show is confidential.

### 1.   "Commercial"

As an initial matter, Right to Life argues that none of the information submitted by Planned Parenthood is "commercial" in nature.  This is so, Right to Life says (at least in its opening memorandum) because Planned Parenthood is a not-for-profit organization and "[n]on-profit entities, by their definition, do not engage in commercial enterprises."[7]  But, as HHS points out

---

[7]In its reply, Right to Life accuses HHS of "misstat[ing] Right to Life's argument that the documents at issue cannot be commercial documents.  It is not simply because [Planned Parenthood] is a non-profit entity."  This court reads the foregoing statement from Right to Life's opening memorandum the same way HHS does.  In any event, Right to Life's reply memorandum continues to press the point that a non-profit

in response, courts applying exemption 4 have recognized that "[a] submitter's 'non-profit status is not determinative of the character of the information it reports.'" N.Y. Pub. Interest Research Grp. v. EPA, 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003) (quoting Critical Mass Energy Project v. NRC, 830 F.2d 278, 281 (D.C. Cir. 1987), rev'd on other grounds, 975 F.2d 871 (D.C. Cir. 1992) (en banc)); see also Am. Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978) (rejecting argument that information was not commercial because the submitter "does not have profit as its primary aim"); Gov't Accountability Project v. Dep't of State, 699 F. Supp. 2d 97, 102 (D.D.C. 2010) (similar).

To the contrary, the scope of "commercial information" under exemption 4 does not depend on the character of the entity that submitted it to the agency, but on the character of the information itself. That much is clear from the language of exemption 4, in which "commercial" modifies the term "information," rather than the term "person" (referring to the

---

entity's information cannot be "commercial" under exemption 4, relying on the definitions of "commercial activities" and "commercial or for profit organization" set forth in an HHS "Facilities Program Manual" and a "Grants Policy Directive." Insofar as these materials set forth mutually exclusive definitions of "non-profit" and "commercial" in a non-FOIA context, the court does not find them instructive in light of the weight of case law, discussed infra, that defines "commercial" as it appears in FOIA itself.

source of the information).  Thus, courts have recognized that "information is 'commercial' under this exemption if, 'in and of itself,' it serves a 'commercial function' or is of a 'commercial nature,'" Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 38 (D.C. Cir. 2002) (quoting Am. Airlines, 588 F.2d at 870)).  In other words, exemption 4 applies "where the provider of the information has a commercial interest in the information submitted to the agency."  Baker & Hostetler LLP v. Dep't of Commerce, 473 F.3d 312, 319 (D.C. Cir. 2006).

Furthermore, because FOIA does not contain its own definition of the term "commercial" as it appears in § 552(b)(4), courts "have consistently held that the term[] 'commercial' . . . in the exemption should be given [its] ordinary meaning." Pub. Citizen Health Research Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983); see also, e.g., Watkins v. Bureau of Customs & Border Prot., 643 F.3d 1189, 1195 (9th Cir. 2011).  That meaning is simply "pertaining to or relating to or dealing with commerce." Am. Airlines, 588 F.2d at 870.

The information that Planned Parenthood submitted to HHS in response to the Notice of Grant Award readily meets this accepted definition of "commercial" as it appears in § 552(b)(4).  As explained in the declarations filed with HHS's summary judgment materials, the manual "provides a model for operating a family

planning clinic," while the other documents contain information
on more discrete aspects of that operation, including setting
rates, managing employees, and collecting accounts.  This is
plainly information serving a "commercial function," i.e.,
guiding the operations of an entity engaged in "commerce" as that
term is commonly understood.

Right to Life nevertheless asserts that "it defies common
sense that the operation of federally subsidized family planning
clinics is commerce."  The court disagrees.  Many kinds of
entities--including, just to name a few, universities, hospitals,
and farms--receive federal grants or other forms of federal
subsidies for their operations, and it cannot seriously be argued
that, as a result, those operations are not "commerce."
Moreover, Planned Parenthood does not fund its clinical
operations solely through federal grants but, as one of its
directors explains in a declaration submitted by HHS, "receives
some of its revenue by accepting private insurance and collecting
cash payments and co-payments from its patients."  HHS has
carried its burden to show that the documents that Planned
Parenthood submitted to HHS in response to the "Notice of Grant"
contained "commercial information" under § 552(b)(4).[8]

_____

        [8]Rather than addressing the definition of "commercial" as
set forth in the case law, Right to Life argues that the term

## 2. "Confidential"

To prove that information falls within exemption 4, HHS must demonstrate not only that the information is "commercial," but also that it is "confidential." 5 U.S.C. § 552(b)(4). Whether commercial information is "confidential" depends, in the first instance, on whether the party who submitted it did so voluntarily, or was required to do so as a condition of doing business with the government. "[C]ommercial information provided to the [g]overnment on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." Critical Mass, 975 F.2d at 879. On the other hand, "'commercial . . . matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the [g]overnment's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." 9 to 5 Org. for Women Office Workers v. Bd. of Governors of Fed.

---

must be "narrowly construed." While, as already noted, all FOIA exemptions must be narrowly construed, Church of Scientology, 30 F.3d at 228, there is no reasonable construction of "commercial," however "narrow," that excludes the day-to-day operations of non-profit entity engaged in commercial activity, even if those operations are federally subsidized.

Reserve Sys., 721 F.2d 1, 8 (1st Cir. 1983) (quoting Nat'l Parks
& Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir.
1974) (footnote omitted by the citing court)).[9]  So, as HHS
acknowledges, when a party was required to submit the information
to the government, "it is not enough that information is the type
of information that the submitter would usually keep secret" to
immunize it from disclosure to a third party under exemption 4.

     HHS has identified both "voluntary" and "required"
submissions among the information that it has withheld pursuant
to exemption 4.  With one exception, Right to Life has not
disputed (in either its own motion for summary judgment or its
objection to the Department's cross-motion) that the Department
has correctly classified certain submissions that Planned
Parenthood made as "voluntary," or that the information contained
in these submissions is "of a kind that would customarily not be
released to the public by the person from whom it was

_____

     [9]Right to Life agrees that this test controls the definition
of "confidential" for materials submitted on a "required" basis.

obtained."[10]  Critical Mass, 975 F.2d at 879.  Based on the
presentation in its summary judgment memorandum, and the
supporting materials, HHS has carried its burden to show that
exemption 4 applies to the information it has characterized as
Planned Parenthood's "voluntary" submissions to the agency.
Again, Right to Life does not argue to the contrary.[11]

Right to Life's sole challenge to the application of
exemption 4 is directed at whether HHS has shown, as to
information that Planned Parenthood was required to submit, that

---

[10]These documents are identified on the revised Vaughn index
as category 35 and part of category 38 (which is Planned
Parenthood's Manual of Medical Standards and Guidelines).  HHS
argues that, while "[t]he majority of Category 38 was a required
submission," seven pages of it were not, because they pertain to
"services that are not funded under Title X."  Right to Life does
not dispute that point, and acknowledges in its objection that it
"does not challenge the withholding of these seven pages."

[11]As to category 35, which consists of documents describing
the steps that Planned Parenthood uses to establish a fee
schedule, Right to Life simply asserts that these are "part of
the fee schedule itself," so that "the document as a whole was a
required submission."  But Right to Life provides no support for
that assertion.  HHS, in contrast, relies on the declaration of
one of its employees to the effect that, while Planned Parenthood
was required to submit its fee schedule, it was not required to
submit information on how it arrived at that schedule.  There is
no genuine dispute, then, that Planned Parenthood's submission of
that information was "voluntary."  As a result, it is
confidential under exemption 4 so long as it "would customarily
not be released to the public by the person from whom it was
obtained."  Critical Mass, 975 F.2d at 879.  As just noted, HHS
has carried its burden to show that the data Planned Parenthood
uses to set its fee schedule fits that description, and Right to
Life has not disputed that point.

the release of that information would likely "cause substantial harm to the competitive position of" Planned Parenthood. 9 to 5, 721 F.2d at 8. HHS, for its part, does not argue that releasing the information that Planned Parenthood was required to submit would likely "impair the [g]overnment's ability to obtain necessary information in the future." Id.

Before analyzing the application of exemption 4 to the particular documents at issue, the court pauses to address an argument that Right to Life repeatedly makes in challenging HHS's invocation of exemption 4. HHS argues that disclosure is required notwithstanding the exemption because "public disclosure would increase the quality of health clinics applying for federal funds while simultaneously decreasing the costs to the taxpayer," or, more broadly, that the "public has a right to know" how Planned Parenthood conducts its operations, since those operations are financed in part through public funds.

As HHS points out, the Court of Appeals for the District of Columbia Circuit has expressly rejected the argument that, in applying exemption 4, courts "should gauge whether the competitive harm done . . . by the public disclosure of confidential information is outweighed by the strong public interest" in its disclosure. Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 903-04 (D.C. Cir. 1999). In declining to

24

adopt this "consequentialist approach" to exemption 4, the court reasoned that "Congress has already determined the relevant public interest" by providing in FOIA that "information should be disclosed unless it comes within a specific exemption," id. at 904, including, of course, the exemption for "commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4).  This court finds this reasoning persuasive--if for no other reason than it simply applies the Act as written.  Right to Life provides no authority to the contrary in any event.  So this court rejects Right to Life's suggestion that, even if material is "confidential" under § 552(b)(4)--in the accepted sense that its disclosure would likely "cause substantial harm to the competitive position of" the person who submitted it--that exemption is nevertheless inapplicable so long as that harm is outweighed by the public interest in the material.

a.   **Manual of Medical Standards and Guidelines and
         Planned Parenthood's letter describing them**[12]

According to the declaration of Planned Parenthood's
Director of Health Care Operations, Helen Reid, submitted with
HHS's summary judgment memorandum, the organization's Manual of
Medical Standards and Guidelines effectively "provides a model
for operating a family planning clinic and for providing the
services consistent with [Planned Parenthood's] unique model of
care."  Reid further explains that the information in the manual
"has been developed over the years" by Planned Parenthood
Federation of America (Planned Parenthood of Northern New
England's national affiliate) and that both organizations "have a
written policy prohibiting their reproduction, reprinting, and
distribution in most cases."

HHS argues that releasing the manual would likely cause
substantial harm to Planned Parenthood by, among other things,
eliminating Planned Parenthood's advantage over its competitors
from its efforts in compiling the manual and maintaining its

_____

[12]Again, the manual is identified on the revised Vaughn
index as category 38, while the letter is category 39.  HHS
explains that the letter, which Planned Parenthood sent to HHS
upon learning of its decision to release portions of the manual,
has been disclosed except insofar as it includes the portions of
the manual that HHS withheld as Planned Parenthood's confidential
commercial information.  Right to Life does not question this
explanation.  The analysis in this section, then, applies with
equal force to the redacted portions of the letter.

confidentiality.  If the manual were publicly released, Reid explains, "[o]ther health care providers, such as community health care clinics, could easily copy the Planned Parenthood model and compete for patients, funding, staff, and providers." This shows that releasing the manual will likely cause Planned Parenthood "harm flowing from the affirmative use of proprietary information by competitors," bringing it within the accepted definition of "confidential" information under exemption 4.[13] Pub. Citizen Health Research Grp. v. FDA, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983).

In arguing to the contrary, Right to Life asserts that HHS cannot show a likelihood of "competitive harm based on the speculation that a hospital or low cost health clinic might compete for the lucrative federal grants in the future."  As Right to Life acknowledges, however, "it is not necessary to show

---

[13]Right to Life relies on Ninth Circuit case, Frazee v. United States Forest Service, 97 F.3d 367 (9th Cir. 1996), for the proposition that a "plan of how to operate [is] not exempt from disclosure under exemption 4."  But the court in Frazee simply ruled, in relevant part, that because the information contained in a submitter's plan for operating recreational campgrounds was "freely or cheaply available from other sources," the district court correctly "determined that the . . . disclosure of the Plan is unlikely to cause substantial competitive harm."  Id. at 371.  Here, in contrast, there is no suggestion that the information in Planned Parenthood's manual is freely available from other sources; Reid's undisputed sworn statements establish that it is not.

actual competitive harm.  Actual competition and the likelihood
of substantial competitive injury is all that need be shown" to
bring commercial information within exemption 4.  Gulf & W.
Indus., Inc. v. United States, 615 F.2d 527, 530 (D.C. Cir.
1979).  Right to Life does not question that Planned Parenthood
faces "actual competition" for grants from hospitals and
community health clinics; indeed, Right to Life states in its
complaint here that, in deciding not to award the Title X
sub-grants to Planned Parenthood, "the Executive Council
specifically requested that hospitals or community health
facilities be found who would be willing to provide the Title X
services" instead.[14]

Regardless, even if those entities did not compete with
Planned Parenthood for grants, Right to Life does not dispute
Reid's statement, just quoted, that those entities compete with
Planned Parenthood for patients.  HHS has carried its burden to
show that releasing the manual would likely cause substantial
harm to the competitive position of Planned Parenthood.

---

[14]Right to Life also relies on the fact that HHS awarded the
replacement grant to Planned Parenthood on a "sole-source," or
non-competitive basis.  As HHS points out, though, that fact has
no effect on whether releasing the manual will likely cause harm
to Planned Parenthood in competing for Title X sub-grants in the
future, given HHS's express statement that, following the
expiration of the sole-source award, "the entire state of New
Hampshire will be in competitive status" once again.

28

**b.    Fees and collections policy**[15]

Reid attests that Planned Parenthood's "'Fees and Collections Policy' is an internal management policy that is not disclosed to patients or the public," addressing, among other things, "issues regarding the timeliness of payment and methods of payment for services, and invoice adjustments."  She further states that disclosing this policy would harm Planned Parenthood's "ability to engage in commercial decision-making about how and whether to charge certain patients, and how and whether to release bad debts"--by, for example, allowing competitors to "design more favorable policies to attract patients away from" Planned Parenthood.

Information that would "enable competitors to solicit [a submitter's] customers with competitive arrangements" has been found to threaten substantial competitive harm and, as a result, to qualify as "confidential" under exemption 4.  Burke Energy Corp. v. Dep't of Energy, 583 F. Supp. 507, 512 (D. Kan. 1984). Right to Life's sole argument to the contrary, that "[t]axpayers have a right to know when grantees chose to rely on government grants for payment for services instead of payment by the patients," is unsupported by the language of FOIA or any caselaw

---

[15]These documents are identified on the revised Vaughn index as category 37.

interpreting it, as already discussed.  See Part III.A.2, supra
(discussing Pub. Citizen, 185 F.3d at 903-04).  HHS has carried
its burden to show that Planned Parenthood's "Fees and
Collections Policies" are confidential under exemption 4.

### c.   Personnel policies[16]

Reid attests that Planned Parenthood's personnel policies
"identify hours of work, compensation and benefit rates, benefit
eligibility criteria, employee orientation, insurance policy
limits, and disciplinary, improvement and termination issues."
She asserts that releasing this information "would allow
competitors to bid against [Planned Parenthood] for providers and
staff, or even hire providers and staff away."

It is difficult for the court to view this information as
"confidential."  In most fields, including health care,
information on how much an employer pays its employees, the
benefits it provides, the conditions under which it expects them
to work, and the like is commonly shared with prospective
employees--including, presumably, those deciding whether the
benefits and burdens of the prospective job make it worth
pursuing when compared to the benefits and burdens offered by
other similar positions.  Reid does not say that Planned

---

[16]These documents are identified on the revised Vaughn index
as category 36.

Parenthood deviates from this common practice in the name of preserving some "competitive advantage" (by, for example, requiring applicants to accept employment there without knowing what their compensation will be or agreeing not to disclose that information as a condition of applying). Nor does Reid identify any practice that prevents Planned Parenthood employees themselves from revealing their salary and benefits to competitors interested in hiring those employees away. Her declaration, then, fails to show that Planned Parenthood faces a likelihood of substantial competitive injury from the release of its personnel policies. See News Grp. Boston, Inc. v. Nat'l Passenger R.R. Corp., 799 F. Supp. 1264, 1269 & n.7 (D. Mass. 1988) (finding that release of payroll information would not likely cause substantial competitive harm to employer).

Furthermore, as Right to Life points out in its objection to HHS's summary judgment motion, Planned Parenthood has already disclosed a list of its employees, their positions, and their salaries in a "Staff List Form" provided to the New Hampshire Department of Health and Human Services. As already noted, disclosure of information that is "freely or cheaply available from other sources . . . is unlikely to cause substantial competitive harm." Frazee, 97 F.3d at 371. While Planned Parenthood's personnel policies contain information beyond the

31

salary data contained in the "Staff List Form," the public availability of that data further undermines HHS's claim that releasing such information would likely cause it substantial competitive harm.  HHS has failed to carry its burden to show that Planned Parenthood's personnel policies are "confidential" under exemption 4.

**B.    Deliberative process and attorney-client privilege** (exemption 5)

Also exempted from disclosure under FOIA are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  This exemption thus shields documents normally immune from civil discovery, including those protected by, among other doctrines, the deliberative process and attorney-client privileges.  See NLRB v. Sears, Roebuck, & Co., 421 U.S. 132, 149-55 (1975).  HHS invokes both of those privileges in defending its ultimate decision to withhold a number of documents, or to produce other documents only in redacted form, in response to Right to Life's FOIA request. Again, HHS bears the burden of showing that these privileges, and therefore exemption 5, apply to the documents in question.  See Church of Scientology, 30 F.3d at 228.  The court will consider each of the claimed privileges in turn.

32

### 1.   Deliberative process privilege

As the court of appeals has explained, the deliberative

process privilege

> is designed to safeguard and promote agency
> decisionmaking processes in at least three ways:
> it serves to assure that subordinates within an agency
> will feel free to provide the decisionmaker with their
> uninhibited opinions and recommendations without fear
> of later being subject to public ridicule or criticism;
> to protect against premature disclosure of proposed
> policies before they have been finally formulated or
> adopted; and to protect against confusing the issues
> and misleading the public by dissemination of documents
> suggesting reasons and rationales for a course of
> action which were not in fact the ultimate reasons for
> the agency's action.

Providence Journal Co. v. Dep't of Army, 981 F.2d 552, 557 (1st

Cir. 1992) (quotation marks and bracketing omitted; formatting

altered).  To establish that the deliberative process shields its

inter- or intra-agency communications from disclosure under FOIA,

the agency must show that the communications are both

"predecisional" and "deliberative."  Id. at 558.  That is, the

communication must have been both "prepared prior to a final

decision in order to assist an agency decisionmaker in arriving

at his decision" and "a direct part of the deliberative process

in that it makes recommendations or expresses opinions on legal

or policy matters."  Town of Norfolk v. Army Corp. of Engineers,

968 F.2d 1438, 1458 (1st Cir. 1992) (quotation marks omitted).

HHS has invoked the deliberative process privilege as to a number of documents encompassed by Right to Life's FOIA requests. Right to Life challenges the invocation of the privilege as to particular documents, and also makes two broader arguments as to the scope of the privilege generally.  These arguments are ultimately unavailing.

First, Right to Life asserts that "even if documents would otherwise be protected by the deliberative process privilege," they "still need to be produced if the opinion or interpretation was later adopted by the agency."  On this view, "HHS can withhold the deliberative advice of subordinates . . . that was rejected," but "cannot withhold the deliberative advice . . . that was accepted" by the agency in making its decision.  As HHS points out, though, the Court of Appeals has explicitly held that an agency's "[e]xpress adoption of a predecisional document is a prerequisite to an agency waiver" of the deliberative process privilege that would otherwise apply.  Providence Journal, 981 F.2d at 558.  Indeed, the court indicated that, to effect such a waiver, the "agency must expressly adopt or incorporate [a] predecisional document by reference in [its] final decision." Id. (quotation marks, bracketing, and ellipse by the court omitted).  Right to Life does not point to any documents embodying or announcing any "final decision" by HHS that

34

incorporate by reference any of the documents as to which the agency has claimed the deliberative process privilege.  Under Providence Journal, the fact that the final decision happened to be consistent with those pre-decisional documents is not enough.

Second, Right to Life relies on another decision by the Court of Appeals for the proposition that "where the documents sought may shed light on alleged government misfeasance, the [deliberative process] privilege is routinely denied." Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 885 (1st Cir. 1995) (quotation marks omitted).  In upholding the district court's refusal to apply the deliberative process privilege in that case, however, the Court of Appeals relied on a "strong showing of arbitrariness and discriminatory motives" on the part of the agency and the district court's finding that the agency had "acted in bad faith over a lengthy period of time." Id. Right to Life has not alleged, let alone made a "strong showing," of anything of the sort here.  At worst, Right to Life accuses HHS of unlawfully awarding the grant to Planned Parenthood on a non-competitive basis.  Even if that charge could be proven, it would not amount to the sort of "malfeasance" that the Court of Appeals has deemed sufficient to pierce the deliberative process privilege.  See id.

Aside from these broader attacks, Right to Life does not dispute HHS's invocation of the deliberative process privilege as to several of the documents it has withheld on that basis.  Based on its review of the materials submitted by HHS, the court concludes that HHS has carried its burden to show that the deliberative process privilege applies to those documents.[17]  But Right to Life challenges HHS's invocation of the deliberative process privilege as to other documents, arguing that they are not "predecisional," and, in one case, also not "deliberative."  For the reasons set forth below, the court rules that HHS has carried its burden to show that the deliberative process privilege applies to these documents as well--with the exception of the one category that Right to Life argues, correctly, are neither predecisional nor deliberative.

### a.   Predecisional

HHS has invoked the deliberative process privilege as to several documents that are dated subsequent to August 19, 2011.[18]  HHS claims that these documents pre-dated its September 14, 2011 decision to award the grant to Parenthood.  See Part I.A, supra.

---

[17]These documents are identified on the revised Vaughn index as categories 1-12.

[18]These documents are identified on the revised Vaughn index as categories 21, 25, and 27.

In response, Right to Life argues that HHS actually reached that decision on August 18, 2011 (at the latest), so that these subsequent documents could not have been "prepared prior to the final decision" at issue, bringing them outside the protections of the deliberative process privilege. Town of Norfolk, 968 F.2d at 1458. As HHS points out, however, the decision it made on August 19, 2011, was not to award the grant to Planned Parenthood, but to solicit an application for the grant from Planned Parenthood on a non-competitive (or "sole source") basis.

That much is clear from the memorandum from Keefe, the Deputy Assistant Secretary for Population Affairs at OASH, to Kretschmaier, the OASH executive officer, dated August 18, 2011. See Part I.A, supra. While the memorandum "request[s] approval of a sole source replacement grant award" to Planned Parenthood, it also explains that, "[i]f this recommendation is approved, OPA will reach out to the proposed replacement grantee to determine if the organization is willing to take on the project as a directly funded federal grantee" (underlining omitted). The memorandum does not say, as Right to Life suggests, that approval of the recommendation will result in the award of the grant itself to Planned Parenthood. To the contrary, as Keefe explains in a declaration filed with HHS's reply brief, the decision embodied in Kretschmaier's countersignature to the memorandum

"was that it permitted [Planned Parenthood] to apply for the grant without competition.  It did not mean . . . that the grant had been awarded to" Planned Parenthood.

In arguing to the contrary, Right to Life relies solely on a document dated September 8, 2011 (after the memorandum) and entitled "Technical Review," which was disclosed, albeit in redacted form, in response to Right to Life's FOIA requests.[19] Indeed, in its response to HHS's summary judgment motion, Right to Life maintains that the "Technical Review" shows that HHS actually made the decision to award the grant to Planned Parenthood on August 12, 2011, i.e., a week before Kretschmaier countersigned Keefe's memorandum on August 19, 2011.[20]  On this theory, additional documents withheld on the basis of the

---

[19]This is the document filed under the docket number (25-7) that Right to Life cites in making this argument in its brief. While Right to Life also cites a Bates number, that number does not correspond to any of the pages of docket no. 25-7.  Because Right to Life does not otherwise describe the document on which it intends to rely for this argument, the court is left to evaluate the argument in light of the document that Right to Life actually cites, docket no. 25-7, which is the Technical Review.

[20]In further support of this argument, Right to Life asserts that, because Keefe's memorandum to Kretschmaier is entitled "Sole Source Justification for Replacement Grant in New Hampshire," it is "just that--a justification for a decision that had already been made."  That is wholly inconsistent with the substance of the document, through which Keefe seeks Krestchmaier's sign-off on awarding the grant on a sole source basis by offering a "justification" as to why that is appropriate.

deliberative process privilege (emails and other documents that
HHS says were exchanged among its employees in reaching the
August 18, 2011 decision embodied in Kretschmaier's
countersignature to the memorandum) would also post-date the
relevant decision.[21]

But Right to Life does not explain how the "Technical
Review" supports this theory, and, on the court's reading, it
does not.  The "Technical Review" evaluates a proposal from
Planned Parenthood "for a single source grant to continue
services it had provided in New Hampshire under a contract with
the [New Hampshire] Department of Health and Human Services."
The very fact that HHS was evaluating Planned Parenthood's
proposal for the grant in early September 2011, of course, belies
any suggestion that HHS had already decided to award the grant in

---

[21]These documents are identified on the revised Vaughn index
as categories 13, 15, 16, 18, and 19.

mid-August 2011.[22]  HHS has carried its burden to show that the
documents as to which it invokes the deliberative process
privilege are predecisional, in the sense that they predated
either the August 19, 2011 decision to solicit an application for
the grant from Planned Parenthood on a sole-source basis
(categories 13, 15, 16, 18, and 19) or the September 14, 2011
decision to award the grant to Planned Parenthood (categories 21,
25, and 27).

### b. Deliberative

Right to Life also argues that HHS has improperly invoked
the deliberative process privilege as to one category of
documents because "there was no specific agency decision to which
the document correlates"--rendering the documents neither
"predecisional" nor "deliberative."  This document comprises two
chains of emails between Hager (the Regional Director of HHS's
Region I Office) and HHS staffers from whom she sought assistance

---

[22]In its sur-reply, Right to Life argues that the decision
"to award a sole source contract" was actually made by "higher
level officials," including the Secretary of HHS and the
President of the United States, on August 9, 2011, and August 10,
2011, respectively, citing to emails between two HHS officials.
This court ordinarily ignores theories raised for the first time
in sur-reply, see, e.g., Beane v. Beane, 856 F. Supp. 2d 280, 298
(D.N.H. 2012), and, in any event, the emails do not support Right
to Life's position.  They reflect simply that the Secretary and
the White House were "briefed" on or around August 10 (while
noting that, as of August 17, OASH was still working to get the
approval of both Kretschmaier and the White House).

in preparing for a telephone call with Executive Councilor
Wheeler about the consequences of the Council's decision to
discontinue Planned Parenthood's subgrants.[23]  See note 2 and
accompanying text, supra.

Pointing out that the redacted portions of these emails
discuss "options for providing responses to Wheeler's questions,
and the suggested answers to those questions," HHS argues that
this "information was predecisional and deliberative to Hager's
participation in the call with Wheeler."  But HHS does not
explain how an agency representative's "participation" in a
telephone call with an elected official amounts to a "decision"
so as to bring documents advising the representative on what to
say within the auspices of the deliberative process privilege.
So far as the court can tell, in fact, the purpose of the call
was simply to inform Wheeler about what HHS would do in response
to the Executive Council's decision, presumably as a matter of
agency rule or policy.  And "an explanation of an existing policy
. . . is not protected by the deliberative process privilege."
Nat'l Day Laborer Organizing Network v. ICE, 811 F. Supp. 2d 713,
741 (S.D.N.Y. 2011); see also RTC v. Diamond, 137 F.R.D. 634, 641
(S.D.N.Y. 1991) (noting that the deliberative process privilege

_____

[23]These documents are identified on the revised Vaughn index
as category 9.

41

"does not extend to materials related to the explanation, interpretation or application of an existing policy, as opposed to the formulation of a new policy").  HHS has failed to carry its burden to show that the emails advising Hager on her telephone call with Wheeler are protected by the deliberative process privilege.

### 2.   Attorney-client privilege

To show that the attorney-client privilege exempts a document from disclosure under exemption 5, the agency must show:

(1) that [it] was or sought to be a client of [the attorney;

(2) that the attorney in connection with the document acted as a lawyer;

(3) that the document relates to facts communicated for the purpose of securing a legal opinion, legal services or assistance in legal proceedings; and

(4) that the privilege has not been waived.

Maine v. Dep't of Interior, 298 F.3d 60, 71 (1st Cir. 2002) (bracketing by the court omitted).  To satisfy the third element of this test, the agency cannot "assume[] that the requirement of client communicated confidentiality is satisfied merely because the documents are communications between a client and attorney," but must "identify [a] circumstance expressly or inferentially supporting confidentiality."  Id. at 71-72.

In its opening memorandum for summary judgment, Right to
Life argued that HHS had failed to make this showing in the
supplemented version of its Vaughn index that HHS provided in
mid-July 2012.  See Part II.B, supra.  But, with its response to
Right to Life's motion for summary judgment (and in support of
HHS's own motion for summary judgment), HHS submitted a revised
Vaughn index, together with a declaration from Robert Eckert, an
HHS employee.  These materials state the basis for HHS's
invocation of the attorney-client privilege as to each document
in considerably more detail than the earlier version of the
Vaughn index and, in the court's view, suffice to show the
requisite "circumstance[s] supporting confidentiality."  Maine v.
Dep't of Interior, 298 F.3d at 71-72.  Indeed, Right to Life's
response to HHS's motion for summary judgment does not argue to
the contrary or, for that matter, address HHS's claim of
attorney-client privilege in any way.[24]  The court finds that HHS
has carried its burden to show that the attorney-client privilege

---

[24]It is also worth noting that, in responding to Right to
Life's summary judgment motion, HHS withdrew one of its claims of
attorney-client privilege that Right to Life had identified as
"most egregious[]":  the claim as to the documents identified on
the revised Vaughn index as category 17, which have since been
produced to Right to Life in unredacted form.

shields the information it has withheld from disclosure on that basis in response to Right to Life's FOIA request.[25]

### C.   **Personnel information** (exemption 6)

Finally, HHS has withheld information on the basis of exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[26] 5 U.S.C. 552(b)(6). HHS says that this information "consists of names, private phone numbers, biographical sketches, a [curriculum vitae], and . . . salary information of individual [Planned Parenthood] employees," as revealed in documents that Planned Parenthood submitted to HHS in support of its grant application.

Applying exemption 6 requires the court to "weigh the public interest in disclosure against a privacy interest in the requested information."  Kurzon v. HHS, 2001 DNH 128, 2001 WL

---

[25]These documents are identified on the revised Vaughn index as categories 11, 18, 20, 23-24, and 33.  While HHS also claims the deliberative process and work product privileges as to category 33, the court need not reach those contentions.

[26]These documents are identified on the revised Vaughn index as categories 26, 29, 36, and 39.  The court has ruled that HHS properly withheld portions of the documents in categories 36 and 39 as confidential commercial information under exemption 4.  See Parts III.A.2.a-b, supra.  HHS invokes exemption 6 as to these documents only insofar as they reveal the names of employees of Planned Parenthood or its affiliates.

821531, at *3 (D.N.H. July 17, 2001) (DiClerico, J.) (citing _Dep't of Justice v. Reporters Comm'n for Freedom of the Press_, 489 U.S. 749, 775 (1989)).  HHS, which bears the burden of showing that this exemption applies, _see_ _id.,_ argues that there is no recognized public interest in the information it has withheld under exemption 6, and, even if there were, it would be outweighed by the privacy interests of Planned Parenthood's employees.  The court agrees with this analysis as to some, but not all, of the information HHS has withheld under exemption 6.

While HHS concedes that there is a public interest in "who is running [Planned Parenthood's] clinics"--which HHS says it has disclosed--it maintains that this interest does not extend to "identifying information of middle and lower level employees." Among the information that HHS has withheld, however, is the curriculum vitae of its "Medical Director."  Given HHS's acknowledgment of a public interest in the identity of "who is running [Planned Parenthood's] clinics"--and its corresponding lack of any effort to identify any countervailing privacy interest in the items of that person's professional or educational background that would be contained on his or her curriculum vitae--the court rules that HHS has failed to carry

its burden to show that disclosing the curriculum vitae would constitute a clearly unwarranted invasion of personal privacy.[27]

HHS has succeeded, however, in carrying its burden to show that releasing the names, private phone numbers, and biographical sketches of the other Planned Parenthood employees would constitute a clearly unwarranted invasion of their personal privacy. As HHS points out, the Supreme Court has held that "[t]he only relevant public interest in the FOIA balancing analysis" is "the extent to which disclosure of the information would shed light on an agency's performance of its statutory duties or otherwise let citizens know what its government is up to." Dep't of Defense v. Fed. Labor Relations Auth., 510 U.S. 487, 497 (1994) (quotation marks omitted). Thus, the Supreme Court ruled in that case that the privacy interest of federal civil service employees "in nondisclosure of their home addresses substantially outweighs the negligible FOIA-related public interest in disclosure," so "disclosure would constitute a clearly unwarranted invasion of personal privacy" under exemption 6. Id. at 502 (quotation marks omitted).

----

[27]If the curriculum vitae contains the director's home address, telephone number, or email address, that information shall be redacted from the version of the document produced pursuant to this order, because the disclosure of that information would amount to a clearly unwarranted invasion of personal privacy. See infra this part.

This holding is plainly controlling as to the names, private phone numbers, and biographical sketches of the middle- and lower-level employees of Planned Parenthood--who, unlike the employees in the Supreme Court case, do not even work for the federal government, but for a private organization that receives part of its funding from the federal government.  Right to Life does not identify, and the court cannot conceive of, any public interest in that kind of information, and "the employees' interest in nondisclosure is not insubstantial," for the reasons explained by the Supreme Court.  Id. at 500-01.  Indeed, federal courts have routinely held that exemption 6 applies to the names, addresses, and other personal information of the employees of government contractors.  See, e.g., Painting & Drywall Work Preservation Fund, Inc. v. HUD, 936 F.2d 1300, 1303-04 (D.C. Cir. 1991); Hopkins v. HUD, 929 F.2d 81, 88 (2d Cir. 1991); News Grp. Boston, 799 F. Supp. at 1272; Dougherty, supra, § 38:181, at 256 (citing additional cases).  Right to Life does not provide any authority to the contrary.

Instead, Right to Life points to the fact that Planned Parenthood has already disclosed the names of its employees, their positions, and their salaries in a "Staff List Form" provided to the New Hampshire Department of Health and Human Services.  See Part III.A.2.c, supra.  The Court of Appeals has

47

held, however, that "prior revelations of exempt information do not destroy an individual's privacy interest." Moffat v. Dep't of Justice, 716 F.3d 244, 251 (1st Cir. 2013).

In Moffat, the Court of Appeals ruled that releasing the names of various individuals (including law enforcement officers) contained in a report of a witness interview would work a clearly unwarranted invasion of personal privacy, even though some of those names had been revealed in a redacted version of the report released to the plaintiff prior to his FOIA request. Id. Thus, "[t]he privacy interests the government seeks to uphold remain[ed] as strong as they were before" the release of the report, yet the plaintiff had "not identified a public interest powerful enough to outweigh" them. So Moffat is right on point here, where, as just discussed, Right to Life has failed to articulate any public interest in the names, telephone numbers, or biographical sketches of the mid- or low-level Planned Parenthood employees.

In the absence of this identifying information, however, the court sees little if any privacy interest in the salaries of the Planned Parenthood employees, i.e., accompanied by the titles of the corresponding positions, rather than the names of the employees who hold those positions. There is also a substantial public interest in what government contractors pay their

48

employees, namely, whether the contractors are "spending taxpayer funds efficiently and effectively." News Grp. Boston, 799 F. Supp. at 1271 (ruling that exemption 6 shielded contractor's employees' names and addresses, but not their titles and wages). Accordingly, this court rules that HHS properly withheld the names, personal phone numbers and biographical sketches of Planned Parenthood's middle- and lower-level employees pursuant to exemption 6, but that HHS incorrectly invoked the exemption in withholding those employees' salary information.  See id.

## IV.  Conclusion

For the foregoing reasons, both Right to Life's motion for summary judgment[28] and HHS's motion for summary judgment[29] are GRANTED in part and DENIED in part.  Within 10 days of the date of this order, HHS shall produce the following information to Right to Life:

• the information identified on the revised Vaughn index as category 9;

• the information identified on the revised Vaughn index as categories 26 and 29, insofar as that information consists of the job titles and salaries of Planned Parenthood staff, or the curriculum vitae of its medical director (excluding that person's home address, telephone number, or email address); and

---

[28]document no. 25.

[29]document no. 31.

49

• the information identified on the revised <u>Vaughn</u>
index as category 36.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 30, 2013

cc:  Michael J. Tierney, Esq.
     Joseph Gardner Mattson, Esq.
     Seth R. Aframe, AUSA